# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. CR15-0046-LTS |
| vs. | ‖ | **ORDER** |
| MAX JULIAN WRIGHT, | ‖ | |
| Defendant. | ‖ | |

_____

This matter is before me on a motion for new trial and judgment of acquittal (Doc. No. 159) filed by defendant Max Wright.  Plaintiff (the Government) has filed a resistance (Doc. No. 171) and Wright has filed a reply (Doc. No. 177).  Also before me is the Government's motion to strike Wright's reply (Doc. No. 178) as being too long and too late.

## I.    BACKGROUND

In the third superseding indictment (Doc. No. 98) the grand jury charged Wright with three counts:  conspiracy to distribute heroin/cocaine/Fentanyl causing serious injury and death (Count 1) and two counts of distribution of Fentanyl (Counts 2 and 3).[1]  On November 13, 2015, the Government filed a motion in limine pursuant to Federal Rule of Evidence 104(a).  Doc. No. 88.  On February 17, 2016, I entered an order (Doc. No. 129) granting in part and denying in part the motion.  Relevant to Wright's present motion, I stated:

> The Government is entitled to offer into evidence, pursuant to a limiting
> instruction, the certified judgment of Wright's most-recent conviction,

---

[1] At trial, Wright did not contest Counts 2 and 3.

dated August 7, 2008 (attached as Exhibit 3 to the Government's motion).
Unless and until ordered otherwise, however, no reference shall be made
in the presence of the jury to any of Wright's other prior convictions.

Doc. No. 129 at 6.

On February 19, 2016, I entered a final order regarding jury instructions (Doc. No. 134) in which I stated, among other things, that I would reserve deciding whether to give a buyer/seller jury instruction until after the close of the evidence. *Id.* at 1-2. Trial then began on February 22, 2016.[2] On February 29, 2016, I denied Wright's motion for a buyer/seller instruction. I stated:

> The defense submitted a brief, the government also submitted an argument, and I can't remember in what context but both parties have submitted argument on the issue of the buyer/seller instruction, I've read all of the cited cases, I've also actually over the last week read what I think to be at least going back 10 years every Eighth Circuit case addressing buyer and seller instruction. Having done that review of Eighth Circuit law, I'm firmly convinced that a buyer/seller instruction is not appropriate based on the evidence that I have heard at this time. The case I find most persuasive, not that one is much different than the other, is *United States v Tillman*, 765 F.3d 851 (8th Cir. 2014). There's a discussion beginning at 835 which [] cites the Eighth Circuit general rule that the instruction is not appropriate when there's evidence of multiple drug transactions as opposed to a single isolated sale. I tend to agree with the defense that I don't really think the Eighth Circuit means that 2 sales or 3 sales automatically ends the buyer/seller possibility, but we've heard evidence of a lot more than a few isolated sales of heroin and drugs in this case. The other reason I think *Tillman* is an interesting and instructive case is the Court goes on to say, look, even if arguably a separate buyer/seller instruction should have been given, there's no prejudice here, because the Court's instructions about what is and what is not a conspiracy cover the concepts, and basically give the defense the chance to make the argument to the jury. The language cited in *Tillman* mirrors the language that's on pages 9 and especially 10 of our jury instructions that we've already given to the jury. That's instruction Number 5 talking about the elements of the conspiracy offense, and particularly under element 2, which discussion begins on Page 9 and carries

---

[2] The trial jury was not sworn until February 23, 2016, as jury selection required a second day.

over onto Page 10. [There are] factors of what [is] not enough to show that a person joined into the agreement. Those factors mirror the factors that the *Tillman* court identified, as covering the concept sufficiently so that even if under the facts of *Tillman* a buyer/seller instruction should have been given, it was not error to not give it in that particular case because the instructions already dealt with the concept. I find that the Court's instructions here, since they mirror those approved in *Tillman* and based on the evidence that I have heard and my interpretation of the Eighth Circuit case law, I find that [a buyer/seller instruction] is not appropriate, and that in any event, the Court's instruction Number 5 already tells the jury what a conspiracy is and what it isn't and allows the defense to make its argument accordingly so I am going to deny the defense request for a separate buyer/seller instruction. Certainly there's no doubt that it's been timely requested, and argued very thoroughly by the defense and so the record should reflect that the defense has made a timely request for a buyer/seller instruction and I simply find based on the evidence and the applicable law that that instruction is not appropriate so I will not be giving that instruction.[3]

On March 1, 2016, after both parties rested, I denied the defendant's oral motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(a), stating:

I've now heard the arguments of counsel. I'm going to deny the defendant's Rule 29 motion in all regards. I find there is sufficient evidence in the record presented by the government for the jury if they believe the evidence, and obviously, the credibility is a huge issue that has to be weighed by the jury if the jury believes the evidence presented by the government, the jury can find all of the liability elements of the conspiracy offense charged in Count 1, and I also find that the jury is entitled to find, if it believes the evidence presented by the government, that drugs supplied in furtherance of the conspiracy, were the but for cause of each alleged incident of serious bodily injury or death, so I do find that the government is entitled to have Count 1 submit to the jury along with each of the alleged incidents of serious bodily injury or death, so the Rule 29 motion is denied, and I will be

---

[3] The parties apparently miscommunicated and failed to order a trial transcript. Doc. No. 171-1 at 3. The lack of a trial transcript clearly hindered the quality of the parties' arguments and also complicated my review of the issues. All quotations from the trial proceedings in this order are from the court reporter's rough, daily Realtime transcripts, not an official transcript.

submitting all of the charges described in the superseding indictment to the jury.

On March 2, 2016, the jury returned guilty verdicts on Counts 1, 2 and 3. The jury found Wright responsible for less than 28 grams of cocaine, responsible for more than a 100 grams of heroin, responsible for serious bodily injury to C.B, A.Ma (twice), T.H., A.Mo, and A.K., and responsible for the deaths of L.M. and A.Mo.

## II.    APPLICABLE STANDARDS

### A.    Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion is permitted after trial, in which case the court may set aside the verdict and enter a judgment of acquittal. *See* Fed. R. Crim. P. 29(c). It is well-settled that jury verdicts are not lightly overturned. *See, e.g.*, *United States v. Peneaux*, 432 F.3d 882, 890 (8th Cir. 2005); *United States v. Stroh*, 176 F.3d 439, 440 (8th Cir. 1999). The Government, as the prevailing party, is entitled to have the evidence viewed in the light most favorable to them. *See United States v. Peters*, 462 F.3d 953, 957 (8th Cir. 2006). The court must uphold the jury's verdict so long as a reasonable minded jury could have found the defendant guilty beyond a reasonable doubt. *Id*. Moreover, courts "must uphold the jury's verdict even where the evidence 'rationally supports two conflicting hypotheses' of guilt and innocence." *Id*. (quoting *United States v. Serrano-Lopez*, 366 F.3d 628, 634 (8th Cir. 2004)). Additionally, courts should not reconsider the credibility of the witnesses as that is a task for the jury. *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004).

*B.    Motion for New Trial*

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision to grant or deny a motion for a new trial based upon the weight of the evidence is within the sound discretion of the trial court." *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015) (internal citations omitted). A district court may "weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). However, the court should grant a new trial only if "the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *United States v. Rodriguez*, 812 F.2d 414, 417 (8th Cir. 1987). "The standard for granting a motion for new trial is more lenient than for a judgment of acquittal; the court is allowed to vacate any judgment if the interests of justice so require." *United States v. Dean*, 810 F.3d 521, 532 (8th Cir. 2015) (internal citations). However, "[m]otions for new trials based on the weight of the evidence are generally disfavored." *Campos*, 306 F.3d at 579. District courts "must exercise the Rule 33 authority 'sparingly and with caution.'" *Id*. (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). The court's standard of review for a motion for new trial differs from the standard that is applied to a motion for judgment of acquittal.

When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is not whether the defendant should be acquitted outright, but only whether he should have a new trial. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. *United States v. Walker*, 393

F.3d 842, 847 (8th Cir. 2005) (internal citations omitted).  If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.  *Lincoln*, 630 F.2d at 1319; *see also United States v. Johnson*, 474 F.3d 1044, 1051 (8th Cir. 2007) (reiterating applicable standard).

## III.     ANALYIS

### A.     Motion to Strike Reply

The first issue I will discuss is the Government's motion (Doc. No. 178) to strike Wright's reply.

#### 1.     Standard

The timeliness of reply briefs is controlled by the court's local rules:

> The Federal Rules of Civil Procedure, along with federal law, grant each district court the power to adopt rules to govern its proceedings. Fed.R.Civ.P. 83(a)(1); 28 U.S.C. § 2071(a). "Rules of practice adopted by the United States District Courts … have the force and effect of law, and are binding upon the parties and the court which promulgated them until they are changed in the appropriate manner." *Biby v. Kansas City Life Ins. Co.*, 629 F.2d 1289, 1293 (8th Cir.1980) (citing *Weil v. Neary*, 278 U.S. 160 (1929)).

D*eere Credit, Inc. v. Grupo Granjas Marinas S.A. de C.V.*, 2007 WL 401997, at *2 (S.D. Iowa 2007).  A court has inherent power to strike pleadings not timely filed.

Local Rule of Criminal Procedure 47(a) states:

> Local Rule 7 governs motion procedure in criminal cases, except a resistance to a motion in a criminal case must be filed within 7 days after the motion is served, plus an additional 3 days under Local Criminal Rule 45 and Federal Rule of Criminal Procedure 45(c) if the motion is served electronically or by mail.

Local [Civil] Rule 7(g) provides:

> Ordinarily, reply briefs are unnecessary, and the court may elect to rule on a motion without waiting for a reply brief. However, the moving party may, within 7 days after a resistance to a motion is served, file a reply brief, not more than 5 pages in length, to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance. In the reply brief, the moving party must not reargue points made in the opening brief. A reply brief may be filed without leave of court.

LR 7(g).

### 2. Analysis

Wright filed his motion on March 17, 2016. After properly requesting and receiving an extension (*see* Doc. No. 162), the Government filed its resistance on April 12, 2016. Doc. No. 171. Wright filed his 34-page reply brief on May 18, 2016. Doc. No. 177. Wright did not request an extension of his deadline or seek permission to file an over-length reply. Thus, he clearly violated the court's rules regarding the timeliness and length of reply briefs. However, as noted in the Government's motion to strike, the reply does not raise new issues and mainly repeats points made in Wright's initial brief. As such, and while I cannot say that the reply brief is particularly helpful, I find no prejudice in considering it and will therefore deny the Government's motion to strike.

In denying the Government's motion, I do not mean to encourage Wright's counsel's behavior. A basic expectation of any attorney practicing in this court is that he or she will review and follow the court's local rules. Filing an over-length brief long after its deadline, with no explanation, is not an acceptable practice.

### B. Hearsay Objections

Wright argues that Government exhibits 703, 703(a), 703(b), 902(a) and 1001 are inadmissible hearsay.

*1.    Standard*

Hearsay is defined as a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  Hearsay is generally inadmissible.  Fed. R. Evid. 802.  Statements made by an opposing party are not hearsay (Fed. R. Evid. 801(d)(2)) nor are statements by a co-conspirator (*United States v. Bell*, 573 F.2d 1040, 1045 (8th Cir. 1978)).  Finally, "[a] statement offered to show its effect on the listener is not hearsay." *United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) (*quoting United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013)).

*2.    Argument*

Wright states:

> Over Mr. Wright's objection, the government introduced records of text messages sent between various individuals involved in this case. Those records were admitted in error as they contained hearsay statements that do not fall under any exception. Certain statements attributable to Mr. Wright and Mr. Anderson from these records were nonhearsay as admissions by party opponent for the government.  However, the statements attributable to other individuals were not of this nature. To the extent that they were offered for the truth of the matters they asserted, they were admitted in error. Moreover, the records contained far more information than simply the contents of the text messages. The records purported to show the dates and times that the messages were sent, the telephone number of the phones that sent and received the messages, and the contact name stored for one of the parties alleged to have been involved in the conversations.  These statements were necessarily offered for their truth. They were hearsay statements that did not fall under any exception and should have been excluded. The Court's erroneous admission of the text message records without appropriate redactions was an error that prejudiced Mr. Wright and necessitates a new trial.

Doc. No. 159 at 53.  The Government responds that the text messages were properly admitted.  Like the defendant, the Government fails to cite any applicable law other than the general definition of hearsay.

### 3.    Analysis

On February 23, 2016, while questioning Officer Matthew Cummings, the Government attempted to offer a 96-page log of text messages (exhibit 703).[4]  The messages in exhibit 703 were from two cell phones Cummings recovered during a traffic stop of co-conspirator Deshawn Anderson.  Wright asserted a hearsay objection and I indicated that while the Government had laid adequate authentication evidence, it had failed to establish why the text messages contained in exhibit 703 were not hearsay.[5]  The Government agreed to withdraw exhibit 703 without prejudice.

On February 29, 2016, the Government called Anderson to the stand as a cooperating witness.  Anderson admitted that the phones contained in exhibit 704 were his.  He also admitted that exhibit 703 contained records of the text conversations between Wright and Anderson, as well as conversations between Anderson and other individuals to whom he sold drugs.  The Government then reoffered exhibit 703.  After argument, I overruled the defendant's hearsay objection and admitted exhibit 703.  The Government then offered exhibits 703(a) and (b), which are subsets of exhibit 703 that highlight only the text conversations between Anderson and Wright while excluding all other messages.

At the outset, I note that conversations between Anderson and Wright were clearly admissible as admissions by co-conspirators and the party-opponent.  *See* Fed. R. Evid. 801(d)(2)(A) and (d)(2)(E).  Similarly, all texts sent by Anderson are co-conspirator statements.  I ruled during the trial that Anderson's co-conspirator statements were

---

[4] Text messages, of course, are written messages exchanged between cell phones.

[5] At that time, the Government made no argument that actually addressed the hearsay issue.

admissible under *Bell*. The statements by customers to Anderson, regarding potential sales, were admissible because they were not offered for the truth of the matter, but rather for the effect that they had on Anderson (usually his agreement to meet with someone to provide them drugs). The remainder of exhibit 703, however, is problematic in that it contains a large amount of irrelevant information. Among other things, the log contains numerous texts from Anderson's mother scolding him for not calling her, random conversations with unknown individuals about news events, texts from Anderson's cell service provider about buying more minutes and texts about Anderson getting his car serviced. The Government erred as a matter of trial tactics, if not legally, by not redacting the exhibit to only relevant information. However, the irrelevant information was not offered for the truth of the matter asserted (for example, the Government did not offer the communications to prove that Anderson often failed to call his mother).[6] Moreover, because the information was so clearly disconnected from any issues relevant to the charges against Wright, any error in its admission was harmless.

Exhibit 902(a) is a log of text messages between Cameron Weber, a Government cooperating witness who testified to buying drugs from Wright, and Wright himself. Wright's statements are clearly admissible and Weber's statements were not offered for the truth of the matters asserted. Instead, they were admitted to show the effect they had on Wright (Weber would request to meet Wright and Wright would then provide arrangement details). Exhibit 1001 is substantially similar, as it is a record of texts between Government cooperating witness Amy Kiefer, who admitted to buying drugs from Wright, and Wright himself. For the reasons set out above, those messages were admissible. Wright's motion for a new trial based on the admission of inadmissible hearsay is denied.

---

[6] Additionally, both during trial and in his written brief, Wright failed to point to the specific portions of the exhibit he sought to exclude.

C. *Wright's Criminal Record*

Wright renews his pretrial argument that I should have excluded evidence of his prior criminal record pursuant to Federal Rule of Evidence 404(b), which provides that evidence of other crimes is not admissible to show a defendant's propensity to commit crime but may be admissible for other purposes, such as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). In my order on Wright's motion in limine (Doc. No. 129), I ruled that his older convictions were too remote in time to be admitted and that admitting evidence of multiple drug-related convictions would be unfairly prejudicial. However, I found that Wright's 2008 Wisconsin state court conviction for delivery of cocaine was proper 404(b) evidence and allowed the Government to enter exhibit 912 to prove that prior conviction. Doc. No. 129 at 5. To the extent Wright challenges that prior ruling, his motion is denied for the reasons set out in my prior order.

Wright makes an additional argument that the Government used the prior conviction for an impermissible purpose during trial. However, he acknowledges that the Government "argued that the prior conviction could be considered to determine whether Mr. Wright had knowledge that this was heroin trafficking." Doc. No. 159 at 41. That is the exact purpose for which the evidence was admitted. I find no error in the Government's argument. Accordingly, Wright's motion is denied.

D. *Buyer/Seller Instruction*

Wright argues that I erred by not giving the model Seventh Circuit instruction regarding a drug buyer/seller that he requested. Specifically, Wright asked that I instruct the jury:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of [name of drug] do not enter into a conspiracy to [distribute [name of drug]; possess [name of drug] with intent to distribute] simply because the buyer resells

the [name of drug] to others, even if the seller knows that the buyer intends to resell the [name of drug]. To establish that a [buyer; seller] knowingly became a member of a conspiracy with a [seller; buyer] to [distribute [name of drug]; possess [name of drug] with intent to distribute], the government must prove that the buyer and seller had the joint criminal objective of distributing [name of drug] to others.

Seventh Circuit Pattern Jury Instruction 5.10(a) (2012); *see also* Doc. Nos. 122, 135.

"A defendant is entitled to a specific jury instruction conveying the substance of the request if it is timely, supported by evidence, and correctly states the law." *United States v. Tillman*, 765 F.3d 831, 834 (8th Cir. 2014). Wright argues that his proposed Seventh Circuit instruction is consistent with Eighth Circuit law. I agree.[7] However, inconsistency with controlling law is not why I declined to give the instruction. As set out above, I declined to give the instruction because (a) the facts in this case supported a finding of a large number of drug transactions[8] and (b) the instructions provided to the jury adequately conveyed the law as it relates to an alleged distribution conspiracy.[9] I see no reason to change my prior ruling. Accordingly, Wright's motion is denied.

---

[7] The Seventh Circuit appears to place less emphasis than the Eighth Circuit on the number of drug transactions. Eighth Circuit law indicates that if more than a few transactions occur, the buyer/seller instruction is not appropriate.

[8] As cited above, I relied heavily on *Tillman* in concluding that although a buyer/seller instruction may be appropriate when there is evidence of only one, or a few, drug transactions, it is not appropriate when the evidence shows numerous drug transactions. The Eighth Circuit stated: "Tillman's participation in the conspiracy spanned years, with multiple drug transactions and multiple customers. Because it was not a single, isolated sale, the buyer-seller instruction was not supported by the evidence." *Tillman*, 765 F.3d at 835. In this case, the evidence supported a finding that Wright sold drugs for an extended period of time, to numerous customers, as a primary source of income in concert with Anderson. A buyer/seller instruction was not appropriate.

[9] *See* Doc. No. 149 at 8-10.

*E.    Cross Examination of Anderson*

Wright argues that I erred by disallowing cross-examination about the precise length of Anderson's potential sentence.  Specifically:

> The fact that Mr. Anderson faces a mandatory minimum sentence of life in prison unless he gets a specific recommendation for reduced sentence from the government provides him with an overwhelming source of bias, the force of which cannot be overstated.  The difference between "decades" in prison and "life" is not just quantitative; it is qualitative.  A life sentence is completely unique and cannot be accurately described in any other terms.  The reality of the situation is that the government, the very party seeking Mr. Wright's conviction, is the sole determiner of the rest of Anderson's life.  That is a unique form of bias that cannot be accurately characterized in some sort of sanitized manner.

Doc. No. 159 at 32.

*1.    Standard*

"The Sixth Amendment provides a criminal defendant the right 'to be confronted with the witnesses against him.'  The primary purpose of this right is to guarantee the opportunity for effective cross-examination, particularly with respect to a witness's potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)." *United States v. Walley*, 567 F.3d 354, 358 (8th Cir. 2009).  Regarding cross examination about potential sentences, "the accused should [be] able to contrast the original punishment faced by the witness with the more lenient punishment contemplated by the plea agreement." *Yang v. Roy*, 743 F.3d 622, 627 (8th Cir. 2014) (internal citations omitted).  Courts should be especially concerned by situations in which the jury's credibility determination could be impacted by the significant difference in the sentence the cooperator could receive based on his cooperation. *Id.* (*citing Van Arsdall*, 475 U.S. at 679).  At the same time:

> A criminal defendant's rights under the Confrontation Clause, however, are not without limit.  Courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination

based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam).

*United States v. Brown*, 788 F.3d 830, 833 (8th Cir. 2015)

2.    *Analysis*

Several facts are undisputed.  First, Anderson has at least one prior felony drug conviction and therefore faced a mandatory minimum sentence of life in prison without a substantial assistance motion from the Government.  Second, Wright sought to elicit testimony from Anderson that he knew he faced a life sentence unless he testified against Wright.  Third, because they both have prior felony drug convictions, Anderson and Wright were in the same sentencing situation (*i.e.*, both faced mandatory life sentences).  Fourth, case law prohibits parties from presenting evidence about the sentence faced by a defendant.  *See, e.g., United States v. Thomas*, 895 F.2d 1198, 1200 (8th Cir. 1990) ("To inform a federal jury about a defendant's punishment would only introduce improper and confusing considerations before it.").  Fifth, Eighth Circuit precedent is split regarding the issue of cross-examining a cooperating witness regarding his or her sentence.  In *Walley*, both the defendant and the cooperator faced a five-year mandatory minimum.  The trial court directed the defense that it could cross examine the witness regarding the "significant" sentence he faced, but not the specific sentence.  The Eighth Circuit affirmed that decision, stating:

We are not persuaded that evidence of Pender facing a "five-year sentence" rather than a "significant sentence" would have given the jury a "significantly different impression" of Pender's credibility.  *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. 1431.  The jury was aware that Pender was subject to a significant sentence, and that the court could reduce the sentence

14

only upon motion of the government. Walley complains that the jury might have thought Pender's "significant sentence" was only two years, rather than five. It seems just as likely, however, that the jury thought "significant" meant that Pender and Walley faced a possible term of ten years or twenty. (Indeed, the malleability of the term makes us wonder why the government thought it an improvement over the actual mandatory minimum.) And even if the jury thought the sentence, without reduction, would be two years, it does not follow that the jury would have appraised Pender's credibility more favorably when the record does not show the extent of reduction that the witness expected. For example, if the amount of expected reduction were held constant, which witness would appear more biased to the jury-the witness hoping to reduce a sentence from two years to probation, or a witness hoping to reduce a sentence from five years to three? In sum, we do not think that whatever marginal value might have been derived from presenting evidence that Pender faced a specific minimum sentence of five years is sufficient on this record to demonstrate that the court's ruling violated Walley's rights under the Confrontation Clause. *See United States v. Arocho*, 305 F.3d 627, 636 (7th Cir. 2002), *abrogated on other grounds by United States v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004); *Cropp*, 127 F.3d at 359 ("The appellants … have been unable to explain why questions about exact sentences feared and sentences hoped for were necessary when the jury was already well aware that the witnesses were cooperators facing severe penalties if they did not provide the government with incriminating information."); *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995).

*Walley*, 567 F.3d at 360. *Walley* is contrasted with two earlier cases in which the Eighth Circuit found error when the district court refused to allow defendants to cross-examine cooperating witnesses about the specific mandatory sentences they faced before cooperating. *See United States v. Caldwell*, 88 F.3d 522 (8th Cir. 1996), and *United States v. Roan Eagle*, 867 F.2d 436 (8th Cir. 1989).[10] However, in both cases the court found the error harmless:

---

[10] In *Walley*, the court distinguished *Caldwell* and *Roan Eagle* because in *Walley* the cooperator faced a potential reduction based on his testimony, whereas in the earlier cases, the cooperators had already received their sentence reductions. *Walley*, 567 F.3d at 360.

Although the jury did not learn the extent of the break Jones received for cooperating, Jones testified that his sole reason for testifying was to obtain the reduced misdemeanor charge. In addition, even if we entirely disregard Jones' testimony, the government's case against Caldwell-which included the defendant's own inculpatory statements-was strong. After reviewing the record in light of all the foregoing factors, we conclude that the district court's error was harmless beyond a reasonable doubt.

*Caldwell*, 88 F.2d at 525.

When a witness who has entered into a plea agreement and, as contemplated in the plea agreement, takes the stand to give evidence against a co-defendant, the credibility of that witness is highly relevant. To constitute effective cross-examination, an advocate's inquiry into the terms of the agreement is essential. *Giglio v. United States*, 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it."). Despite the fact that we have enunciated a rule that would seem to lead us to hold for Roan Eagle, this is a situation where the credibility of Brave was not really an issue. Brave's testimony did not incriminate Roan Eagle in any way. Brave's professed amnesia about the events of that night, was testimony, no matter how "pleasing" to the prosecutor, which could not have led the jury to any conclusion about the guilt of Roan Eagle. We, therefore, conclude that although the trial court patently erred, the error was harmless.

*Roan Eagle*, 867 F.2d at 443-44.

Here, Wright's counsel asked Anderson a series of questions leading up to the following: "And you knew after they increased the charges to conspiracy with overdoses and deaths, you knew that with a prior drug dealing conviction, the only sentence -- " At that point, the Government objected and argued that evidence of Anderson's sentence would necessarily inform the jury of Wright's sentence. I instructed Wright's counsel to "stay away from the specific penalty." Wright's counsel then requested a side bar.

At side bar I stated: "The problem is it's the same charge that your client has so you're telling the jury what the penalty is going to be if your client is convicted." Defense

counsel argued that because Anderson faced the unique penalty of life in prison, no euphemism would properly inform the jury of the value of his cooperation. Specifically, Wright's counsel stated: "I think any prejudicial impact it has in terms of the jury thinking, 'well maybe [] Mr. Wright faces the same penalty,' I think it's outweighed by substantial probative value, I think it would be a significant difficulty if we can't tell them that he's facing a significant unique penalty which he is. He may never get out of prison." I rejected this argument and ruled that Wright's counsel could not ask Anderson if he faced a mandatory life sentence. I also told Wright's counsel:

> The problem is you told the jury why it's an automatic life sentence, you told them because of his prior conviction, it's an automatic life sentence, so now it makes it unbelievably easy for them to connect the dots when they find out your client also has a prior. If you hadn't taken that step, and just said, you knew at that point you were facing a life sentence, that would have been appropriate, but you've told them why and now you've made it very easy for them to figure out that your client has the same problem.

I then solicited suggestions on how to convey to the jury the seriousness of the penalty Anderson faced. The parties agreed to an alternative in which Wright's counsel would ask Anderson to agree that he faced a mandatory minimum of "decades" in prison. Defense counsel proceeded to question Anderson about the fact that he faced "decades of his life" in prison unless he testified against Wright. Among other things, Anderson agreed to the following statement: "The only way that you knew of, could think of, that it was possible as far as you understood, to get less time than this mandatory minimum of decades in prison, was to find someone to cooperate against, right?"

There is no doubt that this issue intersects two firmly established points of law. The jury should not hear evidence about the specific sentence faced by a defendant, but the defendant has a Sixth Amendment right to establish bias by showing the benefits received by a cooperating witness. As noted above, a trial judge retains latitude to balance issues of potential prejudice when considering a Confrontation Clause question. I am persuaded that I appropriately balanced the competing interests. The question is

whether the desired testimony (that Anderson faced a mandatory minimum of life) would have given the jury a "significantly different impression" than the allowed testimony (that Anderson faced a mandatory minimum of decades in prison). *Walley*, 567 F.3d at 360. I find that the allowed testimony, "decades in prison," gave the jury a substantially-similar impression as the desired "life in prison" testimony. For a witness of Anderson's age (44), the jury could surmise that "decades" in prison is closely analogous to life in prison.[11] Thus, the jury was adequately informed of the severity of the sentence Anderson faced unless he testified against Wright, while not being informed of the exact sentence faced by Wright himself. This allowed the jury to consider whether Anderson's testimony was motivated by a desire to avoid an extremely-harsh sentence.[12]

---

[11] For that same reason, I find the defendant's argument that the phrase "decades" in prison misled the jury into believing that Wright would receive a lighter sentence than the mandatory minimum unpersuasive. The jurors were aware of the fact the charged conduct implicated Wright in the death of several people. The goal of the phrase "decades in prison" was to retain some ambiguity about the exact sentence Wright would receive if convicted. I find that the phrase achieved that goal.

[12] I am aware that this decision is not universally accepted. For example, Wright cites *United States v. Larson*, 495 F.3d 1094, 1105 (9th Cir. 2007), in which the Ninth Circuit considered a situation similar to that present here. The district court excluded specific testimony that the cooperator faced a mandatory sentence of life in prison. The Ninth Circuit seemed to hold that when a cooperator faces life but for his cooperation, only testimony of the actual sentence will adequately inform the jury of the potential bias:

> The probative value of a mandatory life sentence is significant. A cooperating witness who faces a statutorily mandated sentence of life in prison unless the government moves for reduction of the sentence has a compelling incentive to testify to the government's satisfaction. Thus, the mandatory nature of the potential sentence, the length of the sentence, and the witness' obvious motivation to avoid such a sentence cast considerable doubt on the believability of the witness' testimony. . . [W]hile the Government has an interest in preventing a jury from inferring a defendant's potential sentence, any such interest is outweighed by a defendant's right to explore the bias of a cooperating witness

In addition, and as I stated at side bar, I find that Wright's counsel contributed to the situation by telling the jury, in his question to Anderson, that a "prior drug dealing conviction" was the cause of the sentence Anderson faced. Because the jury was going to hear that Wright also had a "prior drug dealing conviction," allowing Anderson to answer the question, as phrased, would have made it made it clear that Wright likewise faced a life sentence. Frankly, as I listened to counsel's questioning it was obvious to me that he was attempting to signal to the jury that Wright would receive a life sentence if convicted. Given the timing of the Government's objection, counsel for the Government clearly agreed. This situation could have been avoided if Wright's counsel would not have predicated his question on the fact that Anderson had a "prior drug dealing conviction." The fact that Wright's own counsel contributed to the need for balancing competing interests further persuades me that my resolution of the issue was appropriate.

Finally, even if a Sixth Amendment violation did occur, I find the error to be harmless. As will be discussed in detail below, numerous witnesses testified that Wright and Anderson seemed to work together when distributing drugs. Even discounting the credibility of Anderson's testimony, there was sufficient evidence upon which a jury could find that Wright engaged in a conspiracy to distribute drugs. For these reasons, Wright's motion is denied.

---

who is facing a mandatory life sentence. . . Taking the above factors into account, we conclude that the district court abused its discretion, violating Defendants' Sixth Amendment constitutional right to effective cross-examination when it prevented defense counsel from exploring the mandatory life sentence that Lamere faced in the absence of a motion by the Government.

*Larson*, 495 F.3d at 1104-08.

*F.*   *Inconsistent Testimony*

Wright argues that the Government committed a due process violation by knowingly introducing evidence that was contradictory and perjured.

*1.*   *Standard*

   *a.*   *Inconsistent Testimony*

 "'To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime,' and the [prosecution's] error must have 'rendered unreliable' the habeas petitioner's conviction." *Clay v. Bowersox*, 367 F.3d 993, 1004 (8th Cir. 2004) (quoting *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.), *cert. denied*, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000)). In *Smith*, the court held "only that the use of inherently factually contradictory theories violates the principles of due process." *Id*. The factual contradictions must be more than "minor variations in testimony or defects in memory" that might arise, for example, from the lapse of time between trials. *Id*. On the other hand, due process is violated, and the convictions are infirm, when, in its zeal to obtain multiple convictions, the prosecution relies on diametrically opposed testimony from the same witnesses. *Johnson v. United States*, 860 F. Supp. 2d 663, 862-63 (N.D. Iowa 2012) (internal citations omitted).

   *b.*   *False Testimony*

The government may not "introduce or elicit testimony known to be false," *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), "or allow false testimony to stand uncorrected," *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. White*, 724 F.2d 714 (8th Cir. 1984). However, no constitutional violation occurs when the government has no reason to believe that the testimony was false. See *White* at 717 (*citing United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir. 1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982)).

*United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992). To prove a due process violation based on false testimony, the defendant must show:

> "(1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007). Merely inconsistent statements do not establish use of false testimony. *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995). "[I]t is not improper to put on a witness whose testimony may be impeached." *Perkins*, 94 F.3d at 433. Compare *Bass*, 478 F.3d at 951 (no due process violation where the witness told different stories and defense counsel knew as much as government), with *Napue v. Illinois*, 360 U.S. 264, 265, 272, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (holding due process violation where the prosecutor promised the witness "consideration," the witness testified the prosecutor promised nothing, but the prosecutor did not correct the witness).

*United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010).


### 2. Analysis

Wright states:

> In this case, Marcus Wallace testified that he did not know Max Wright. He testified that he was not Max Wright's customer. He testified that he only knew Deshaun Anderson, who was his marijuana dealer. He testified that he first began selling heroin after asking Anderson if he had a source for it. He testified that he always called Anderson to set up his heroin purchases. He testified that he negotiated prices with Anderson. The government presented this testimony. They relied on it. They called upon the jury to rely on it. However, this testimony from Mr. Wallace was diametrically opposed to the testimony of Deshaun Anderson. Anderson testified that Wallace was Max Wright's customer and he only dealt with him because Wallace had a relationship with Wright and Wright told him to do so.

Doc. No. 159 at 29. Additionally:

> Katherine Baird testified that she had Anderson's number and called him to purchase heroin regularly. Anderson explicitly testified that this never

happened. He said she only called him for heroin one time. Again, the government presented the testimony of two witnesses who provided diametrically opposed testimony. Ms. Ainseworth-Meyers testified that Anderson gave him her number and told him not to tell Wright. She testified that she set up deals directly with Anderson when Wright was out of town. Anderson testified none of that ever happened. He said it was all false. Again, the government presented the jury with diametrically opposed testimony and claimed the jury could rely on it all.

Doc. No. 159 at 30. Wright goes on to allege that witnesses Weber and Belsha contradicted Anderson as to whether they called Anderson to buy heroin. Wright also alleges that witnesses Young and Hill contradicted Anderson about whether Anderson could lower the heroin price. Finally, Wright contends that witnesses Ciha and Mercer contradicted Anderson about the number of times they bought drugs from him.

At the outset, I note (as the Government did) that the prohibition on inconsistent testimony applies to defendants in *different* cases. The rationale is that it violates due process for prosecutors to present one theory of the case when trying the first defendant but then present a contradictory theory in a subsequent prosecution of a co-defendant. In the classic example, it is inappropriate to first prosecute Bonnie, argue she was the shooter, secure a conviction, and then prosecute Clyde while arguing he was the shooter. The due process violation occurs, in part, because the two juries have no way to know about the contradictory testimony. Wright cites no case law, and I could find none, holding that the prosecution commits a due process error simply because some facts presented within the same trial were inconsistent. Within the confines of the same trial, the jury is charged with considering inconsistent testimony, reconciling it and reaching a verdict. *See, e.g.,* Court's Jury Inst. No. 10 (Doc. No. 149 at 22-25).

More firmly grounded in sound law is Wright's argument that the Government committed a due process violation by knowingly offering false testimony. As the case law set out above makes clear, a prosecutor is barred from presenting knowingly false testimony. However, the defendant has the burden to show that (1) the prosecution used

perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict.

Regarding Wallace, Wright misstates the trial testimony. Wallace stated that he primarily purchased heroin from Shady (Anderson), whom he knew first, but also obtained heroin from D (Wright). Specifically, the Government asked Wallace who provided drugs if Anderson was not available and Wallace answered that Wright arrived with the drugs. Wallace further testified he understood that Shady and D worked together to sell drugs. Wallace stated he obtained drugs from D six or seven times (out of a total of twenty purchases).

Anderson did contradict Wallace's testimony to some extent, telling the jury that he met Wallace through Wright, that Wright had the original relationship with Wallace and that he only began selling to Wallace after Wright introduced them. The question is whether this contradiction amounts to a knowing introduction of false and uncorrected testimony. I find it does not. Wright has not offered any evidence that the Government knew the testimony of either witness was false. Additionally, although there is a contradiction, Anderson and Wallace agreed on the key point that Anderson and Wright worked together to distribute heroin. Considering that agreement, the issue of who first knew Wallace is a relatively minor point unlikely to affect the jury's decision. Ultimately, "[t]he jury is responsible for assessing the credibility of witnesses and resolving conflicts in testimony, and its conclusions on these issues are virtually unreviewable on appeal." *United States v. Thompson*, 560 F.3d 745, 748–49 (8th Cir. 2009). This is a situation in which two witnesses told somewhat different stories, each side was equally aware of the contradiction, and the jury was able to resolve it and reach a verdict. I find no error.

Similarly, Baird testified that Shady and D were "partners" and that her group of friends sometimes obtained heroin from D. She stated that she personally met with Shady when he was in a gray van but that she generally knew Shady and D were partners because

they used the same vehicle. She stated that her friends "George and Jeff" would usually get heroin from D, but sometimes her friend Donny obtained it from Shady, stating: "I would go to Donny's house, Shady would go before [I] would get there, drop it off, and I would get it through Donny." She stated that she rarely interacted with Shady but sometimes passed him as she arrived at her friend's place. She also stated that she could get drugs directly from Shady because she had his number, but rarely did so because "I didn't like his attitude." Meanwhile, Anderson testified that Baird called him on one occasion to obtain heroin but did not regularly call him for heroin. This testimony is consistent. Anderson and Baird were generally aware of each other, but only directly interacted occasionally. More importantly, there is no indication that the prosecution knew that any of this testimony was (allegedly) false.

Ainseworth-Meyers testified that she first met D through Wallace and then obtained drugs from D. Eventually, she learned D's number and sometimes when she called D for heroin, Shady would deliver it. She testified that she also eventually learned Shady's direct number. Ainseworth-Meyers testified that D preferred her to call his phone, not Shady's, but that she would occasionally call Shady. Meanwhile, Anderson testified he did not give his phone number to Ainseworth-Meyers. Anderson indicated that she probably got his number from Wright and that Ainseworth-Meyers would call him to get heroin when Wright was out of town. Again, there is little inconsistency in the testimony. The inconsistency relates to how Ainseworth-Meyers obtained Anderson's phone number and how frequently she called Anderson. However, there is no indication that the prosecution knowingly presented false testimony. This is the precise type of slight inconsistency that the jury is charged with resolving.

The remaining contradictions Wright alleges fall into the same categories. It is true that Weber, Belsha, Ciha and Mercer made statements about how and when they received drugs from Anderson that were slightly inconsistent with Anderson's testimony. For example, the witnesses testified that Anderson would occasionally cut them a deal on

24

the price, whereas Anderson testified that Wright set the prices. However, there is no indication that prosecution knowingly presented false testimony, or that the allegedly-false testimony could have affected the jury's verdict. Overall, the witness testimony was remarkably consistent about the relationship between Anderson and Wright and the way in which they conducted their heroin operation. Wright has failed to establish a due process violation.

## G.    *Failure to Disclose Cooperator Information*

Wright makes several arguments that are based on the Government's (admitted) failure to disclose certain information about its cooperating witnesses.

### 1.    *Failure to Disclose Information*
#### a.    *Standard*

"The Jencks Act requires that the prosecutor disclose any statement of a witness in the possession of the United States which relates to the subject testified by the witness on direct examination." *United States v. Stroud*, 673 F.3d 854, 863 (8th Cir. 2012)(quoting *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir. 1992)). A "statement" is defined as "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 18 U.S.C. § 3500(e). "If the United States elects not to comply . . ., the court shall strike from the record the testimony of the witness . . . unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d). Both bad faith by the

government and prejudice to the defendant must be shown to overturn a conviction based on Jencks Act violations. *United States v. Vieth*, 397 F.3d 615, 619 (8th Cir. 2005).

Under *Brady v. Maryland*, 373 U.S. 83, 85 (1963), a prosecutor must disclose any evidence favorable to the accused and material either to guilt or punishment.

> This duty extends not only to evidence of which a prosecutor is aware, but also to material "favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

*United States v. Robinson*, 809 F.3d 991, 996 (8th Cir. 2016).

> "[a] prosecutor has a duty to disclose evidence known by police officers, even if not known by the prosecutor," a prosecutor has an attendant duty to learn of such evidence. *United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008). This attendant duty to learn of material and favorable exculpatory or impeachment evidence necessarily anticipates that a prosecutor will have an opportunity to discover such evidence through the exercise of reasonable diligence.

*Id*.

*Brady* is violated if three requirements are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Morales v. Ault*, 476 F.3d 545, 554 (8th Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). The government must provide *Brady* material to the defendant at a time sufficient for him to make use of it. *Morales*, 476 F.3d at 554 (finding a mid-trial disclosure violates Brady only if it comes too late for the defense to make use of it) (citing *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005)).

> For purposes of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), for failure to disclose evidence, the Eighth Circuit Court of Appeals has held that "[e]vidence is not material simply because it would have 'help [ed] a defendant prepare for trial.'" *United States v. Spencer*, 753 F.3d 746, 748 (8th Cir. 2014) (quoting *United States v. Aleman*, 548 F.3d 1158, 1164 (8th

Cir. 2008) (citing *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976)). Rather, "'[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Ellefsen*, 655 F.3d 769, 778 (8th Cir. 2011) (quoting *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009) (quoting in turn *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)). "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

*United States v. Rojas*, 2014 WL 4410120, at *4 (N.D. Iowa 2014).

The scope of exculpatory evidence under *Brady* incorporates information which may impeach a government witness. *Giglio v. United States*, 405 U.S. 150, 153-55 (1972). Put another way: "Under *Brady* and its progeny, prosecutors have a duty to disclose to the defense all material evidence favorable to the accused, including impeachment and exculpatory evidence." *Robinson*, 809 F.3d at 996. "[T]he purpose of requiring disclosure of impeachment information is not to assist the defense in a general pretrial investigation, but only to give the defense an opportunity to effectively cross-examine the Government's witnesses at trial." *United States v. Eisenberg*, 773 F. Supp. 662, 685 (D.N.J. 1991). The timing of the government's disclosure of *Giglio* material is the same as that for *Brady* material.

### b.     Facts

The Government sets out the facts giving rise to this portion of Wright's motion:

On March 1, 2016, an Assistant United States Attorney (not a member of the trial team) observed a portion of the closing arguments from the courtroom gallery. After the case was submitted to the jury, that AUSA informed the trial team that he thought he recognized the name of one of the government trial witnesses, Bonnie Schliemann, from a prior case. The next day, that AUSA informed the trial team that Ms. Schliemann had, in fact, testified before the grand jury in a case the grand jury was investigating during 2013. The AUSA then acquired the transcript of Ms. Schliemann's testimony and provided it to the trial team. During her grand jury

testimony, Ms. Schliemann testified about purchasing crack cocaine from another individual (not defendant) in about 2008. Ms. Schliemann testified she participated in the controlled buys because she was trying to "work off" a charge related to something that happened during the flood of 2008, but that even after doing the buys she was convicted of the charge anyway. Ms. Schliemann's prior grand jury testimony and prior work as a confidential informant in 2009 were unknown to the trial team until after the close of evidence. During trial prep sessions with the "customer" witnesses who testified at defendant's trial, the trial team asked each witness about any prior criminal convictions. Each witness was asked about any bias they may have against defendant or any motivation they may have to lie about defendant. During the trial prep sessions, no customer witness mentioned any prior unrelated cooperation with the CRPD, or that any such cooperation gave them any motivation to lie about defendant's activities. The United States also ran criminal history checks for each witness and provided copies of the results to defense counsel prior to trial. Whether a witness had previously worked as a confidential informant in unrelated matters was not a standard question of the customer witnesses. At the time of trial, all *Giglio* information known by the trial attorneys and DEA case agents was disclosed to defense counsel.

Upon learning of Ms. Schliemann's prior work as a confidential informant, the DEA case agent contacted the Cedar Rapids Police Department to inquire into the details of Ms. Schliemann's cooperation, as well as whether any other government trial witnesses had previously worked as a confidential informant with that agency. During that check, it was determined that Amy Kiefer and Jason Gavin had also previously participated in controlled buys as confidential informants for CRPD in unrelated matters.

With respect to Ms. Schliemann's prior cooperation, it was learned that in 2009, Ms. Schliemann was facing a felony theft 2nd charge. She cooperated and participated in three controlled buys between September and December 2009, in exchange for some consideration at sentencing on the theft charge. Court records reflect Ms. Schliemann was initially sentenced to a deferred judgment in that case, but later had her probation revoked. CRPD files reflect that then-Narcotics Officer Laura Faircloth was the handling agent for Ms. Schliemann on the controlled buys. Officer Faircloth has not been on the Narcotics Unit for several years, and had no involvement with the investigation into defendant.

With respect to Ms. Kiefer, it was determined that in June 2012, Ms. Kiefer was facing potential charges of possession of drug paraphernalia and possession of methamphetamine precursors. Ms. Kiefer participated in one controlled buy with CRPD on June 14, 2012, and was not charged with the drug and paraphernalia violations at the conclusion of her cooperation. CRPD Narcotics Officer Matt Cummings was the agent with whom Ms. Kiefer worked on the buys. Officer Cummings testified at defendant's trial regarding surveillance he conducted during controlled buys from defendant and an associate of defendant's in May and June 2015.

With respect to Jason Gavin, CRPD files reflected that in November 2012, he faced potential charges of possession of drug paraphernalia and possession of prescription drugs. He participated in one controlled buy on November 12, 2012, in exchange for some consideration at sentencing for those charges. [The undersigned notes that upon hearing after trial that Mr. Gavin had previously worked as a confidential informant, the undersigned recalled a discussion with Mr. Gavin before his grand jury testimony in Mr. Wallace's case. During that discussion, Mr. Gavin indicated he had previously worked as a confidential informant for CRPD on an unrelated drug matter. The undersigned believed that Mr. Gavin's prior work as a CI was discussed during that grand jury testimony, but a subsequent review of Mr. Gavin's grand jury transcript revealed that recollection was incorrect. The grand jury testimony only involved Mr. Gavin's work as a confidential informant in the Wallace case.] Randy Jernigan was the handling agent for Mr. Gavin for the controlled buy. Officer Jernigan testified at defendant's trial regarding a controlled buy conducted in this case involving Mr. Gavin buying heroin from Marcus Wallace in February 2015. He also testified regarding his participation in a search at Deshaun Anderson's residence in North Liberty in April 2015.

Additionally, during the search of CRPD files, the prosecutors were informed that on May 8, 2015, Glenden Belsha, in an effort to cooperate with the CRPD Narcotics Unit following his involvement in the March overdose of Amanda Marquis, attempted a recorded phone call to defendant. The recorded call was unsuccessful, as defendant did not pick up. Belsha was paid $20 for the attempt. Two officers present for the attempted recorded call to defendant were Jared Hicks with the CRPD Narcotics Unit and DEA Special Agent Gregg Fox, the federal case agent in this investigation.

Upon receiving this information from CRPD, on March 3, 2016, the undersigned disclosed the information to defense counsel by email. See GE 1 (attached, under seal). Defense counsel responded with some follow up questions, and the United States tracked down some additional information. On March 8, 2016, the undersigned sent a follow-up email with additional requested information. See GE 2 (attached, under seal).

Doc. No. 171-1 at 4-8.[13]


### c.    Argument

Wright states:

In order to obtain a new trial, a defendant must show three things: (1) the government (whether state or federal) suppressed evidence; (2) the evidence was favorable to the defense, either because it was exculpatory or had impeachment value; and (3) the evidence was material to an issue at trial. *Brady*, 373 U.S. at 87; *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009). Here, it is essentially indisputable that information relating to government witnesses' prior cooperation with law enforcement, and prior receipts of benefits for that cooperation, was "suppressed" as that term applies in the context of *Giglio*. Likewise, there is no doubt that this evidence had impeachment value. It was evidence of explicit bias in favor of law enforcement and the government. The principle argument in this case will concern materiality.

Docket No. 159 at 8.[14] Wright goes on to argue:

Nor is their [sic] any doubt that the information is beneficial to the defense. "Under *Giglio v. United States*, 405 U.S. 150, 153–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the government must disclose matters that affect the credibility of prosecution witnesses." *United States v. Morton*, 412 F.3d 901, 906 (8th Cir. 2005); *Pederson v. Fabian*, 491 F.3d 816, 826 (8th Cir. 2007) ("Well-settled United States Supreme Court precedent teaches that

---

[13] Wright does not challenge the Government's version of events.

[14] The Government agrees. "The United States does not contest that the information was inadvertently suppressed, as it was not disclosed prior to the trial." Doc. No. 171-1 at 11.

evidence tending to impeach the credibility of prosecution witnesses may be subject to the disclosure requirements of *Brady*."). The credibility of the addict witnesses in this case was central to the government's case. The government repeatedly argued that the witnesses were credible because they had no motive to lie. What the defense did not know was that at least some of the witnesses have a history of cooperating with law enforcement and receiving a benefit. They know from prior experience that helping law enforcement protects them from prosecution for drug crimes that they were caught committing in this case. And they have been helped by law enforcement before. Therefore, they have explicit bias in favor of the prosecution. If they assist the government and provide helpful testimony, then they will be able to continue with their drug use without incarceration or interference. The unavoidable conclusion is that these witnesses have a significant bias in favor of the government that is created by their prior experiences with cooperation with law enforcement and receiving a benefit as a result. These witnesses have every reason to expect that, if they testify in a way pleasing to the government, they will not be prosecuted. This runs directly contrary to the government's argument that they "had nothing to gain." They have everything to gain: their continued freedom, the continued ability to use heroin without fear of the interference of enforcement. Therefore, this evidence is certainly beneficial to the defense.

Doc. No. 159 at 10-11. Wright highlights the drug quantity issue:

The evidence presented by these witnesses is especially critical, and indeed absolutely necessary, to a finding on the drug amount. The jury's verdict indicated that they did not believe Mr. Anderson's testimony regarding drug quantity. He testified that the conspiracy involved more than 280 grams of cocaine base. Yet, the jury found that 280 grams of cocaine base was not proved. Therefore, in order to establish the drug amount, the jury had to rely on the testimony of the addict witnesses. They had to "add up" the various drug amounts alleged by those witnesses. The government argued that the witnesses had no motivation to skew their testimony to the government's favor. This is not the case. Schlieman, Kiefer, Gavin, and Belsha had an experience of admitting to drug dealing and then receiving a benefit for their assistance in securing convictions. This is evidence of powerful bias specifically because the witnesses in this case did not have an explicit agreement indicating how much of a benefit they could expect or whether they could be charged for drug crimes they admitted. A reasonable person could view the determination of whether they would be charged for their admitted drug crimes to be dependent on whether they gave testimony

that led to conviction. Therefore, these witnesses have a greater, not lesser, motivation to skew their testimony to the government's benefit. . . In this case, counsel argued that the addict witnesses could not be believed with sufficient specificity to establish drug amount beyond a reasonable doubt. Specifically, defense counsel argued that, although there was no promise in this case, the witnesses had not been prosecuted. In addition, because the witnesses were addicts their memory could not be relied upon. The impeaching information withheld by the government would have added another problem with their testimony: when the witnesses have helped law enforcement in the past, they have received a benefit. Therefore, the witnesses had a motivation to skew, or at the very least, estimate upward, when estimating drug amount. *United States v. O'Conner*, 64 F.3d 355, 359 (8th Cir. 1995) (finding suppressed impeachment information material in part because it buttressed defense argument). The jury should have heard that information.

Doc. No. 159 at 14-15. Additionally, Wright states:

The fact that some witnesses [have] a reason to hope for a benefit is every bit as material as a benefit promised. For example, in *Reutter v. Solem*, 888 F.2d 578, 580 (8th Cir. 1989), the prosecution failed to disclose the fact that one of its witnesses was currently seeking a commutation of his sentence. Had the defendant been apprised of this information, he could have argued that the witnesses had a motivation to testify favorably to the government to assist in his commutation application. *Id*. No promise was made and there was no quid pro quo. Nevertheless, the question is what the witness might have expected, not what was reasonable to expect. *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989)

Doc. No. 159 at 16. Finally:

[A] prosecutor's statements in closing argument can render withheld evidence material. *Cvijanovich v. United States*, No. 3:07-CR-55, 2011 WL 2680485, at 10 (D.N.D. July 8, 2011) (reversing where the prosecution indicated that the defendant had "nothing that he could gain" from cooperating with the state); *Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989) (same); *United States v. O'Conner*, 64 F.3d 355, 360 (8th Cir. 1995) (reversing where "[t]he Government stressed throughout trial that the [witnesses] would not lie because if they were caught in a lie, they would lose the benefit of their plea bargains."). Here, the government used every direct examination to highlight the idea that these witnesses had nothing to

gain from their testimony, no reason to believe they would get any benefit, and were promised nothing. They made the same argument in closing. The undisclosed evidence directly undermines that idea. These witnesses did have reason to believe that testimony that helped the government would aid them in avoiding prosecution or getting money or getting reduced sentence. It had happened to them before. Undisclosed evidence that would undermine the government's central argument for the credibility of these witnesses cannot be immaterial. The suppression of this impeaching evidence constitutes a *Giglio* violation requiring a new trial.

Doc. No. 159 at 17.

The Government responds by stating:

None of the information is "material" for purposes of *Brady*, in that the potential impeachment value of the evidence was so slight that there was no reasonable probability of a different result in the trial. Defendant's bias argument for Ms. Schliemann, Mr. Gavin, and Ms. Kiefer is essentially the following: (1) when the witness was facing criminal charges on a prior occasion, the witness cooperated and participated in controlled buys to make investigators happy and receive some reduced punishment on those charges; (2) the witness was facing some sort of criminal punishment in this case; so (3) the witness sought to make the investigators happy in this case by implicating the target of their investigation, defendant. This logical path fails for each of the witnesses, and defendant has not met his burden to demonstrate the prior cooperation by any of these witnesses is "material" for purposes of *Brady*.

Doc. No. 171-1 at 11-12. Regarding Schliemann, the Government argues that contrary to Wright's assertion, she was not testifying against Wright under the threat of prosecution.

Although Schliemann admitted to being an active heroin user, she was not testifying at defendant's trial in order to mitigate charges or punishment as she had in 2009. There is no evidence that Schliemann was ever threatened with prosecution for heroin possession. Defendant had, and took, a full opportunity to cross-examine Ms. Schliemann on her possible bias in favor of the government related to the fact that she had not been charged as a result of her admissions of present drug use. Second, according to Ms. Schliemann's grand jury testimony, her cooperation in the prior case did not result in her having charges waived.

Doc. No. 171-1 at 13. Finally, the Government notes that text messages contained in exhibit 703 independently confirm Schliemann's testimony.

Regarding Jason Gavin, the Government argues:

> Gavin testified in this case that he acted as a confidential informant in order to get some consideration on a drug paraphernalia charge arising from his overdose in February 2015. He testified about the controlled buy of heroin from Marcus Wallace in which he participated in February 2015. Defendant fails to clearly explain the incremental impeachment value of the years-old, unrelated cooperation.

Doc. No. 141-1 at 15. Additionally, Gavin's trial testimony was that he bought drugs from Wallace, not Wright.

The Government's primary argument regarding Kiefer is that her testimony was corroborated by other witnesses, and the text message log from her phone (exhibit 1001) provides independent evidence that she set up drug deals with Wright. Regarding Belsha, the Government conceded that failing to disclose that he had been paid as part of the investigation into Wright was a *Giglio* violation, but argued that the defendant adequately crossed him regarding bias.

### d.    Analysis

At the outset, I note that the Government's failure to discover and disclose the above-discussed information was completely inappropriate. One non-involved AUSA fortuitously overhearing a portion of the closing argument resulted in the Government's discovery of easily-knowable *Brady/Giglio* information about *four* different witnesses. This situation reeks of a failure to properly investigate the Government's case. This failure is even more astonishing considering that this case involves multiple victims and a defendant who, according to the Government, faces a mandatory sentence of life in prison. If the Government could not be troubled to thoroughly investigate its witnesses in this case, one wonders when it might ever decide to do so. Regardless of whether the

Government's abject failures here warrant a new trial, the United States Attorney and his assistants are hereby put on notice that I will not tolerate future violations of this nature and will explore all available sanctions if these violations recur.

Regarding the alleged *Brady* violation, I find that the first two factors are easily met: the evidence was favorable to the defendant and it was suppressed. I reject the Government's apparent argument that the suppressed information is not helpful to the defendant. Regarding Schliemann, the Government's principal argument is that because Schliemann previously cooperated, and did not receive a benefit, she would have no incentive to testify for the Government in this case. But that logic is clearly faulty; the exact opposite could be true. Because Schliemann previously cooperated, but did not get a break, it could provide her incentive to try even harder to please the Government in this case. Additionally, the Government has no good argument regarding Belsha and Kiefer. Kiefer had previously worked as a cooperator to get a reduced sentence. Obviously that information is favorable to Wright. And the Government literally paid Belsha for his participation in helping build a case against Wright. Impeachment evidence rarely gets more obvious.

The Government has a stronger argument regarding Garvin, who did testify in this case about a benefit he hoped to receive by cooperating. Nonetheless, the defense had a right to know of the potential bias Wright faced because Gavin has a history of cooperating with the Government.

Having shown that favorable evidence was suppressed, the only real question is whether this information was material such that, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Ellefsen*, 655 F.3d at 778. After a careful review of the record, I am convinced that even if the Government had fulfilled its obligations and disclosed the favorable information, the result in this case would have been the same. I base this conclusion on the following two factors, which I discuss in detail below: (1) the

information would not have significantly changed the jury's impression of the witnesses and (2) the weight of the other evidence would have resulted in a guilty verdict even absent the testimony of these four witnesses.

### i.     *Impression of the Witnesses*

As to the jury's impression of the witnesses, the most egregious piece of evidence suppressed by the Government is the fact that Belsha was paid for his cooperation in the case. However, Wright's counsel was able to impeach Belsha as to a number of issues, starting with the fact that Belsha claimed to be drug free even though his demeanor and appearance suggested otherwise. Wright's counsel also made much of the fact that Belsha had to be arrested on bench warrant because he failed to appear in court to testify. Counsel was able to get Belsha to admit that he had history of lying, including lying to the police. Most importantly, Wright's counsel elicited testimony from Belsha that he directly provided Amanda Marquis the heroin on which she overdosed and that he could face charges for that incident if he did not cooperate with the Government. Although the defendant had a right to know that Belsha had been paid $20.00 for attempting to obtain a recorded phone call, in light of the abundant impeachment information already available to the defendant, it is likely that this information would have been redundant. Having carefully observed (and later reviewed) Belsha's testimony, I find no probability that evidence concerning a $20.00 payment would have affected either the jury's opinion of Belsha or the outcome of the case.

Next is the fact that Gavin previously worked with the Government. Gavin's testimony in this case did not relate directly to Wright. Rather, Gavin testified that he obtained drugs from Wallace until he overdosed. The fact that Gavin overdosed was substantiated by law enforcement. Gavin then testified that after his overdose, he cooperated with law enforcement, including setting up a controlled buy from Wallace. Since the record already clearly substantiated both the fact that Gavin was a user who

purchased from Wallace and that Gavin was a cooperator who helped set up Wallace, the fact that Gavin had previously cooperated with law enforcement is of limited value. I find no probability that this additional information would have resulted in a different verdict.

Regarding Kiefer, even without the information that she had cooperated in the past, Wright's counsel was able to extract testimony from her of her potential bias. Specifically, counsel pointed out that her boyfriend, Ciha, could face charges relating to Amanda Marquis' overdose and that Kiefer was cooperating with the Government in an attempt to protect her boyfriend. Thus, the jury heard evidence that Kiefer had a strong reason to be biased in favor of the Government. Perhaps more importantly, specific pieces of physical evidence supported Kiefer's testimony.

> Additionally, Kiefer's phone was found at the scene of the overdose and contained text messages between Kiefer and "D" (which Kiefer and many other witnesses identified as defendant's nickname) during which Kiefer arranged to purchase heroin from defendant on May 18, 2015. See GE 1001. The content of the text messages identify the two participants in the conversation as "Amy" and "D," and the time frame is shortly before Kiefer's overdose. The text messages show a conversation during which "Amy" and "D" to meet at the apartment building across from "Cum and go on1st." The number associated with "D" in that conversation was "13127659564." Anderson identified this same number as one of defendant's phone numbers in the text messages downloaded from a phone seized from Anderson. *See* GE 703, 703A.

Doc. No. 171-1 at 17.

Schliemann's situation is similar. Her testimony regarding Anderson is supported by physical evidence:

> Moreover, the text messages downloaded from Anderson's phone show defendant and Anderson repeatedly referred to "Bon," whom Anderson identified as Schliemann. (*See, e.g.*, GE 703 at 58, line 658 (incoming text message to Anderson from 6307286086 ("Brogod" – identified as defendant's phone by Anderson) stating "Pul by bon gt tat money")). This

> independent information substantially corroborated Schliemann's testimony.

Doc. No. 171-1 at 13-14. On cross-examination, Wright's counsel was able to impeach Schliemann regarding various issues, including her drug use, numerous prior convictions and most importantly, that she could face charges. Accordingly, I find no probability that introducing the fact that Schliemann had cooperated with the Government in 2009 would have changed the jury's verdict.

### ii.    *Totality of the Evidence*

The second reason I find that the Government's *Brady* violation is not material is that even without the testimony of the four witnesses discussed above, the Government produced enough evidence for the jury to convict Wright beyond a reasonable doubt.[15] First and foremost is the testimony of Anderson.[16] Anderson testified that he and Wright conspired to distribute heroin the Cedar Rapids area. Specifically, Anderson testified that he moved to Cedar Rapids from Chicago with Wright. Anderson testified that when they first moved to Cedar Rapids, they stayed with various acquaintances in exchange for cocaine provided by Wright. Anderson testified that Wright eventually began to sell heroin. According to Anderson, he and Wright moved into an apartment in Cedar Rapids in June 2013, at which time Anderson became an active participant in the drug operation, delivering quantities of heroin to various customers.

---

[15] Nothing in Wright's argument suggests that either with or without the four witnesses discussed above, the Government failed to prove that the heroin at issue in this case caused the serious injuries and deaths found by the jury. His arguments instead center on the existence of the conspiracy, and to a lesser extent, the drug quantity. Accordingly, I will not review the extensive evidence adduced by the Government that proves serious injury and death. Suffice to say, I find that the evidence supports the jury's verdict.

[16] For the purposes of this section, I will summarize the evidence the jury could, and seemingly did, rely on to convict Wright, and not the various impeachment items that Wright's counsel elicited during cross-examination.

Anderson testified that Wright regularly obtained cocaine and heroin from Mario Grant in Chicago and brought the drugs back to Cedar Rapids to distribute. After the drugs arrived in Cedar Rapids, Anderson and Wright would repackage them for distribution. Anderson testified extensively about the various amounts of drugs they received and distributed. For example, he stated that Wright would bring in a hundred grams of heroin every week. Anderson testified that he and Wright transacted drugs in that manner from the summer of 2013 until the fall of 2014, and then again from the winter of 2014-15 until Anderson was arrested in 2015. Anderson testified that even after Wright moved out of their shared apartment, Wright and Anderson continued to store and repackage the drugs at Anderson's apartment. Anderson stated that one of his primary roles was to watch over the drugs that were left in his care.

Anderson testified that their usual operation involved Wright getting the heroin and the crack, repackaging it, storing it at Anderson's apartment, making customer contacts, and then directing Anderson where to deliver the drugs. Anderson stated that he would then give the money he collected to Wright. Anderson specifically identified various customers to whom he delivered drugs at Wright's behest, including Kiefer, Ciha, Ainesworth-Meyers, Belsha and Schliemann. Anderson stated that the customers did not contact him directly at first, but eventually some customers learned his number and called him directly. He explained that some of the heroin customers were also Anderson's own marijuana suppliers, so they had his contact information.

According to Anderson, Wright became upset when he found out Anderson was being contacted directly by some customers and took Anderson's phone so the customers would have to call Wright instead. Anderson also discussed the van he used to deliver drugs, which is the subject of other evidence. Anderson stated that Wright bought the van for Anderson to use for drug deliveries. As discussed earlier in this order, Anderson also authenticated (a) text messages he received from Wright in which Wright directed Anderson to distribute drugs and (b) text messages from customers requesting that

Anderson provide them drugs.  Finally, Anderson authenticated photographs and other evidence recovered from his home and from the traffic stop during which he was arrested.

To be sure, Anderson's testimony was hardly perfect.  As discussed above, there were some inconsistencies with the testimony of prior witnesses.  These changes often seemed self-serving in that Anderson appeared to minimize his role in the conspiracy. While some witnesses testified that Anderson sometimes cut them a deal or arranged a sale without involving Wright, Anderson's testimony was that Wright called all the shots. Additionally, as discussed above, Anderson had a strong motivation to testify against Wright in order to avoid a mandatory life sentence.  Nonetheless, Anderson provided a mostly-cohesive narrative as to how he and Wright worked together to distribute heroin in the Cedar Rapids area during the time period alleged in the third superseding indictment.

The Government also presented extensive evidence about Anderson's and Wright's customers.  Dalton Young, who worked with the Government to set up Wright, testified that he bought "strong" heroin from Wright for a period of time in 2014 to 2015.  Young testified he bought $50.00 worth of heroin from Wright up to 75 times.  Young also testified that Wright's cousin (photographically identified as Anderson) sometimes delivered the drugs after Young called Wright.[17]

Cameron Weber testified he was a heroin addict who used significantly in 2014. Weber testified that he initially got heroin from David Morgan, who Weber believed obtained drugs from Anderson.  Weber testified that he subsequently called and obtained drugs from both Anderson (identified by Weber as Wright's cousin) and Wright.  Weber stated that he obtained $40 to $50 worth of heroin directly from Wright as many as ten times.  According to Weber, Anderson sometimes delivered the drugs after Weber called

_____

[17] The witnesses used a variety of names to refer to Wright and Anderson.  However, for each witness the Government used photographic exhibits to confirm the identity of the individual to whom the witness was referring.

Wright. Weber also identified phone numbers included in the text logs and stated that he sometimes used text messages to order heroin (*see* exhibit 902(a) for the actual conversations between Weber and Wright). Finally, Weber testified that Dave and Anna Morgan used heroin together and that Weber's girlfriend, Cassandra Clinton, was present during relevant events. Clinton then testified she was present when Weber obtained drugs from both Anderson and Wright. She stated that Weber also obtained drugs from Donny Minor and David Morgan and that she saw David Morgan receive drugs from Anderson. Clinton testified that she sometimes ordered drugs for Weber, that she ordered from both Anderson and Wright, and that sometimes when she called one or the other individually they made the delivery together.

Timothy Hill testified that he was a heroin addict who began buying heroin from Wright in 2013. Hill testified that sometimes when he called Wright for heroin, Anderson delivered it. Hill testified that he was sometimes short of cash when Anderson delivered drugs and that, on those occasions, Anderson called Wright to find out whether he should let Hill have the drugs or not. Hill also testified about getting drugs from Ainesworth-Meyers and being with her when she bought drugs from Wright.

Ainesworth-Meyers testified to buying heroin from Wright, often on a daily basis and up to a gram at a time, during 2013 and 2014. She testified that normally she called Wright but Anderson delivered the heroin. As discussed above, she occasionally called Anderson directly but Wright discouraged her from doing that. She testified that on the day Hill overdosed, she called Wright and obtained heroin from Wright personally before giving some of the heroin to Hill.

Angela Mercer, who is Amy Kiefer's sister and Amanda Marquis' friend, testified that she obtained heroin from Keith Ciha and that this was the heroin Marquis used when she overdosed. She also testified that she saw Belsha give Marquis the heroin she used when she overdosed a second time. Marquis' testimony was substantially similar to that of Mercer.

Ciha, who was Kiefer's boyfriend, testified that for some period during 2014 he obtained heroin from Wright on a daily basis. He stated that when he called Wright, sometimes Wright delivered the heroin and sometimes it was delivered by Anderson. He also testified about giving heroin to Mercer before Marquis overdosed. Dawn Janacek, who knew Ciha, testified that she obtained heroin from Wright on a daily basis. She testified that sometimes when she called Wright for drugs, Anderson delivered them. It should be noted, however, that Janacek had some difficulty identifying both Wright and Anderson.

Chandler Bolton testified that he purchased heroin from Gavin and others beginning in November 2014. He testified that Gavin would not tell Bolton the name of Gavin's supplier. However, he testified that on one occasion he was with Gavin when Gavin called his supplier. According to Bolton, he and Gavin then met up with a minivan with two African-American individuals who supplied Gavin with heroin. Shortly after obtaining this heroin, Bolton used it and overdosed.

Officer Randy Jernigan testified about using Gavin as a confidential informant. Jernigan testified that Gavin identified his supplier as Wallace. He also testified about a controlled buy that he had Gavin conduct with Wallace. Finally, Jernigan testified about executing a search warrant at Anderson's residence. Through Jernigan, the Government offered the 700 series of exhibits, which include numerous photographs and actual drug paraphernalia.

Marcus Wallace also testified. He stated that he met Anderson in late 2014 and began buying, and then redistributing, heroin from him. Wallace testified that he purchased redistribution quantities of heroin (1 to 2 grams at a time) from Anderson up to twenty times and distributed the drugs to Gavin and other customers. Wallace testified that sometimes he obtained the heroin from Anderson but other times obtained it from Wright. He testified that Anderson was the source of the heroin he sold to Gavin during the controlled buy.

Spencer Pool offered some vague testimony that he thought Larry Michaels and/or Aaron Rogers purchased heroin from Wright and/or Anderson, but did not seem to have significant personal knowledge of the transactions and could not identify photographs. He did testify that Michaels and Rogers bought heroin from a male in a blue van – which is how other witnesses described Anderson's vehicle – but stated he never saw the dealer's face.

Rogers testified that he obtained heroin from a friend named Frederick and that he saw Frederick obtain heroin from both Anderson and Wright. Rogers testified he eventually started calling Wright directly for heroin and that Anderson normally delivered it. Rogers testified he would often buy between a half gram and gram of heroin on a daily basis. He also testified about the day Larry Michaels overdosed. According to Rogers, Michaels stated that he had obtained "free bags" of heroin from Anderson and Wright. Rogers testified that later that night, he, Michaels and Spencer Pool met with Anderson to obtain more heroin and cocaine. Rogers stated that when the group returned to his residence, he and Michaels used the heroin. Rogers testified that he then fell asleep for the night and awoke to find Michaels dead.

Kathryn Baird testified that she obtained heroin from her friends George and Jeff who, in turn, received the heroin from Wright. She also testified that she thought her friend Danny Minor obtained heroin from Anderson. Baird testified that she eventually began purchasing heroin directly from Anderson and that she did so more than ten times. She also testified about getting heroin from Shady and sharing it with Anna Morgan the day Baird overdosed (which was shortly before Morgan overdosed). Baird's son, Kristian, testified about the day Kathryn Baird overdosed and largely corroborated his mother's testimony.

Officer Jared Hicks testified about controlled buys he set up in which Dalton Young bought drugs from Wright in May and June of 2015. The Government also offered various exhibits contained in the 800 series, which include audio recordings of

the drug purchases, audio recordings of telephone calls between Young and Wright and the actual drugs Wright sold to Young. Officer David Dostal, DEA Agent Ryan Marriott, Officer Matthew Cummings, Officer Michael Bailey and Agent Kelly Meggers, also testified about the controlled buys. In addition, Cummings testified about his traffic stop of Anderson, which led to Anderson's arrest and the recovery of the cell phones and text messages that were discussed above. Officer Nick Nolte also testified about the stop of Anderson, as did Officer Justin Kaczinski. Finally, DEA Agent Brett O'Connor testified about assisting in the arrest of Wright at his girlfriend's house in Chicago and recovering three cell phones from Wright.

When all of this evidence is considered, along with the physical exhibits, it is clear that the Government proved the existence of a conspiracy between Wright and Anderson to distribute drugs. It is also clear that the Government proved the existence of the conspiracy, including the quantity of drugs found by the jury, even if the testimony of Belsha, Gavin, Kiefer and Schliemann is completely excluded. In addition to Anderson's testimony, witness after witness testified that Wright and Anderson worked together to distribute drugs and that if the witness called Wright to set up a transaction, Anderson sometimes showed up with the heroin.

While I am reluctant to do anything that might be seen as excusing or trivializing the Government's conduct, I must follow the applicable law. Having heard and considered the evidence that overwhelmingly supports the jury's verdict, I am unable to find a reasonable probability that the result of the proceeding would have been different if the suppressed information had been disclosed to the defense. Indeed, I find just the opposite. Given the nature of the suppressed information, I find virtually no probability, reasonable or otherwise, that the result would have been different. As such, Wright has failed to prove that the suppressed information was material and his motion must be denied.

## 2.    *Confrontation Clause*

In Section II of his brief, Wright states:

> Because Mr. Wright did not know about the witnesses' prior cooperation
> deals and successful acts of cooperation with law enforcement, he could not
> fully cross examine them regarding their biases and the substantial benefits
> that they previously received for aiding or assisting the government.

Doc. No. 159 at 19.  The remainder of Wright's confrontation clause argument mirrors the arguments made in Section I (that the suppressed information demonstrated bias) and Section IV (that a defendant has a Sixth Amendment right to confront witnesses about each potential point of bias) of his brief.  However, Wright concedes that the case law does not clearly establish that the Government's failure to provide *Brady/Giglio* information can amount to a confrontation clause violation.  Doc. No. 159 at 19 (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987)).  The Government agrees, stating:

> "The ability to question adverse witnesses, however, does not include the
> power to require the pretrial disclosure of any and all information that might
> be useful in contracting unfavorable testimony." *Ritchie*, 480 U.S. at 53.
> As *Ritchie* makes clear, the focus of the Confrontation Clause analysis is
> whether the trial court improperly restricted questioning by the defense.  It
> is  not  an  independent  method  of  enforcing  pretrial  disclosure  of
> impeachment information."

Doc. No. 171-1 at 20.  Accordingly, I need not consider the *Brady/Giglio* issue separately under the Confrontation Clause.


## 3.    *False/Uncorrected Testimony Regarding the Undisclosed Information.*

Wright also argues that by failing to disclose the suppressed information about the four witnesses at issue, the Government violated *Napue* by knowingly presenting false testimony to the jury.  As set out above, to prevail under *Napue* a defendant must show: (1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured

testimony could have affected the jury's verdict. Assuming (without deciding) that Wright could establish the first two factors, it is clear, based on the above discussion, that he cannot prove the third factor.

As set out above, the Government introduced Anderson's direct testimony about the existence of a conspiracy and presented over a dozen other witnesses who testified about obtaining heroin from Wright and Anderson. Witness after witness testified that when they called Wright for drugs, Anderson sometimes delivered them. Some witnesses testified that Wright and Anderson occasionally delivered drugs together. Even completely excluding the testimony of Belsha, Gavin, Keifer and Schliemann, there is no probability that the jury would have reached a different verdict.


*H.*     *Outrageous Government Conduct*

Next, Wright argues that the Government engaged in such outrageous misconduct that prosecuting him amounts to a due process violation.

> "While there may be circumstances in which the conduct of law enforcement agents is so outrageous that due process bars the government from invoking the judicial process to obtain a conviction, the level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *Id.* (citing *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)) (internal quotation omitted).

*United States v. Nieman*, 520 F.3d 834, 838 (8th Cir. 2008).

Wright argues that the various (alleged) agreements between the Government and certain witnesses should shock the court's conscience. Specifically, he argues that the Government impermissibly promised Anderson and Wallace leniency in exchange for their testimony against Wright and impermissibly advised other witnesses that leniency was contingent on Wright's conviction.

Wright has failed to present evidence of secret and/or improper agreements regarding Wallace and Anderson. Instead, the evidence shows that Wallace and Anderson have fairly-typical plea agreements through which their cooperation may, but is not required to, cause the Government to file motions to reduce their sentences. Nor has Wright alleged the existence of any evidence supporting a finding that the Government made a promise of leniency to any witnesses that was contingent on Wright being convicted. Except as to the suppressed information addressed earlier in this order, Wright had the opportunity to cross-examine all cooperating witnesses regarding their motivations for cooperating. That examination revealed typical grounds for bias, wherein a witness hopes for some leniency based on his or her truthful testimony. Because Wright has failed to allege evidence of any impermissible, conscience-shocking agreements between the Government and any witness, his motion is denied.

I.      *Sufficiency of the Evidence*

Finally, Wright makes a catch-all argument that the evidence is not sufficient to sustain his conviction. In section III(G), *supra*, I discussed the evidence presented against Wright. That evidence was sufficient to support the jury's verdicts of guilty on all counts.

## IV.     CONCLUSION

For the reasons set out above:

a.      The Government's motion to strike (Doc. No. 178) is **denied**; and

b.      The defendant's motion for a new trial/judgment of acquittal (Doc. No. 159) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 7th day of July, 2016.

_____
LEONARD T. STRAND
UNITED STATES DISTRICT JUDGE